UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

STORYVILLE DISTRICT                          CIVIL ACTION
NEW ORLEANS, LLC, ET AL.

VERSUS                                       NO. 10-1694

CANAL STREET DEVELOPMENT                     SECTION "F"
CORPORATION, ET AL.

<u>ORDER AND REASONS</u>

Before the Court is the defendants' joint motion to dismiss
or, in the alternative, to abstain or stay.  For the reasons that
follow, the motion is GRANTED in part and DENIED in part.

**<u>Background</u>**

This civil rights lawsuit concerns a subtenants' operation of
a mechanical bull on its subleased premises, which resulted in a
state trial court ruling, during an eviction proceeding, that the
mechanical bull must be removed; the subtenants assert that their
lessors conspired with state actors to remove them from their
subleased Bourbon Street property.

In 1989 the City of New Orleans created the Canal Street
Development Corporation (CSDC),[1] a public benefit, non-profit
corporation, to stimulate business development in the Central
Business District, and to accept the donation of two square blocks
of property, which formerly housed the D.H. Holmes department

---

[1]Cynthia Connick is executive director.

1

store, parking garage, and storage facilities.  On December 1, 1989 CSDC leased the property to Historic Restoration Incorporated (HRI), which in turn transferred and assigned all of its rights in the property and the lease of the property to 800 Canal Street Limited Partnership.  Pursuant to a hotel lease agreement, CSDC leased the property to 800 Canal Street, which operates the Chateau Bourbon Hotel, as well as commercial retail spaces.[2]

In January 1998 800 Canal Street sublet a portion of the property[3] to Storyville District New Orleans, L.L.C., which originally operated a jazz lounge and restaurant.  CSDC was one of the signatories on the sublease between 800 Canal and Storyville; Section 2.01 of that sublease provides that Storyville "shall continuously operate its business operations...in accordance with its Permitted Use set forth in Section 1.01(L)", which provides:

> PERMITTED USE (Section 2.01): The Leased Premises shall be used only for operation of an entertainment club having a character and quality similar to and consistent with that of the Hotel (as hereinafter defined), as of the Effective Date hereof, featuring live musical performances and/or other entertainment, a bar, or lounge, which may serve food and alcoholic and non-alcoholic beverages and the necessary kitchen, office, and support facilities appropriate for this use.  The Leased Premises shall not be utilized for a "fast food" facility or any other use.

---

[2]CSDC obtained a conditional use ordinance with the City to operate a hotel on the property.

[3]The remaining space is used by 800 Canal to operate the Chateau Bourbon Hotel.

Section 2.01(C) of the 800 Canal-Storyville sublease restricts the use of the leased premises, providing:

> The following uses shall be prohibited in the Leased Premises at all times: burlesque-type, strip tease, or adult-oriented entertainment, the sale of merchandise bearing an obscene or sexually suggestive message or art work, a T-shirt shop, souvenir shop or adult establishment (all as defined in the Comprehensive Zoning Ordinance of the City of New Orleans) and fast food restaurant; provided, however, Tenant may offer for sale in the Leased Premises memorabilia related to Tenant's operations.... Nothing contained in this Paragraph shall be construed so as to expand the uses permitted in the Leased Premises which shall be limited to those set forth in Section 1.01(L).

On February 4, 2002 Storyville, in turn, sublet the space to Bourbon Street Management, LLC, which then entered into still another sublease with Howl at the Moon New Orleans, LLC and Jazz Parlor, LLC, all with the approval of CSDC and 800 Canal. As a result of the latest sublease arrangement, the operations in the subleased premises included a restaurant, as well as musical performances such as jazz performances, and a concept known as "Howl at the Moon", which featured live entertainment.

According to the allegations of the complaint, the leased premises and hotel are zoned "CBD 3" under the City's Comprehensive Zoning Ordinances. CSDC obtained a conditional use ordinance with the City to operate a hotel on the property; "live entertainment" is permitted as an accessory use.[4]  "Live adult entertainment" is

_____

[4]Section 2.2(101) of the CZO provides:

where a hotel is permitted as a principal use,

3

included in the CZO's definition of "live entertainment" in §
2.2(110):

> *Live Entertainment.*  A scheduled or planned performance
> or presentation during which both the performer(s) and
> audience are physically present at the time of occurrence
> and that is typically sponsored, promoted, advertised, or
> publicized in advance to attract patrons or guests.  The
> performer(s), who may be amateur(s), participant(s) from
> the audience, patron(s) or guests, need not be
> compensated or remunerated.  These uses include but are
> not limited to the following:
> 1.  A.  Theatrical productions, athletic contests,
> exhibitions, pageants, concerts....
> b.  *Live Adult Entertainment.* Any entertainment that
> features dancers, go-go dancers, exotic dancers, male or
> female impersonators or similar entertainers or live
> entertainment, where persons regularly appear in a state
> of nudity or where live performances are characterized by
> the exposure of specified anatomical areas or by
> specified sexual activities as defined in Section
> 2.2.4(g) and 2.2.4(h)....

For years Storyville and its sublessees featured live musical
performances and other live entertainment, without interference or
objection by 800 Canal or CSDC.  Sometime after Hurricane Katrina
-- "[i]n an effort to reopen its business and meet their lease
obligations to 800 Canal" -- one of Storyville's subtenants
installed a mechanical bull in the sublet premises as part of a
country-western theme restaurant and bar known as The Bourbon
Cowboy; the Bourbon Cowboy operated without objection for some

---

> all uses customarily and historically
> accessory thereto, for the comfort,
> accommodation, and entertainment of the
> patrons, excluding live adult entertainment,
> but including the service of alcoholic
> beverages, shall be permitted.

4

time.

In September 2009 representatives of 800 Canal (and David Abbenanty, HRI's president and Chief Operating Officer, and Steve Nance, HRI's vice president of investments)[5] contacted Storyville, requesting that it relinquish to 800 Canal a portion of the leased premises.[6] The Storyville subtenants refused. In retaliation for this refusal, the subtenants suggest, Abbenanty, Nance, Cynthia Connick, and others then concocted a scheme designed to deprive the sublessees of possession of the leased premises. In furtherance of this scheme, on October 7, 2009 800 Canal notified Storyville that it had breached their sublease by installing and operating a mechanical bull on the premises; the notice threatened eviction. Storyville did not remove the mechanical bull, but it advised 800 Canal that it had placed warning signs near the bull and that it had instituted policies designed to regulate the conduct of patrons riding the bull.[7]

---

[5]According to the complaint, HRI was the general partner of 800 Canal.

[6]The allegations of the complaint suggest that the hotel or 800 Canal was underperforming and failing to meet its lease obligations to the CSDC and that it therefore wanted to re-acquire a portion of the subleased premises in the hopes of improving its financial situation. The complaint further suggests that Connick was aware of this situation and began to "conspire with 800 Canal to attempt to deprive Storyville of its constitutional and civil rights."

[7]Apparently, at times, female patrons at the Bourbon Cowboy would ride the mechanical bull and remove their clothing.

On December 7, 2009 800 Canal Street filed suit in state court, seeking to evict Storyville and its subtenants, alleging that (1) they had routinely encouraged topless women to ride the mechanical bull in violation of Section 2.01(C) of the sublease; (2) they violated the restricted use provisions of the sublease under Section 1.01(L); and (3) they failed to comply with the zoning ordinances for the City, which violated Section 5.02 of the sublease.[8]  According to the allegations of the federal complaint: on February 9, 2010 -- after the close of the evidence in the state eviction trial, but before judgment -- Ms. Connick provoked a secret meeting with Paul May, the Director of the Department of Safety and Permits for the City, in furtherance of the conspiracy to deprive the Storyville subtenants of the leased premises; thereafter May, provided with purportedly incomplete information regarding the eviction proceeding, wrote a letter expressing his opinion:

Dear Ms. Connick

The zoning classification of the above referenced property is CBD-3 Central Business District and the use of the property must comply with the provisions of section 6.4 of the Comprehensive Zoning Ordinance.

A standard restaurant is a permitted use in the CBD-3 District and live entertainment in a restaurant is limited no more (sic) than three musicians and the music is not to be amplified.

---

[8]In their federal complaint, the Storyville subtenants refer to this as the "wrongful eviction suit."

6

> All other forms of live entertainment are prohibited.  In
> this instance, the mechanical bull that is operated on
> the premises would be classified as live entertainment
> and is a violation of the zoning ordinance.
>
> If any clarification is necessary, please contact me....

The plaintiffs in this federal suit maintain that May's letter was
wrongfully solicited by Connick and violated the proper procedure
governing violations of the CZO, which generally requires a
violation or citation to issue, an allowance of 15 days to cure any
violation, followed by proceeding to the Board of Zoning Adjustment
and then to Civil District Court and, if necessary, eventually to
the state supreme court.  Nonetheless, the Paul May letter was
provided to the state court in the eviction proceeding, and the
state court admitted it into evidence over the Storyville
subtenants' objections.[9]

On February 26, 2010 the state court issued its judgment on
800 Canal Street's petition for eviction; the judgment provided:

> IT IS ORDERED, ADJUDGED AND DECREED that there be
> judgment herein in favor of Defendants, STORYVILLE
> DISTRICT NEW ORLEANS, L.L.C., BOURBON STREET MANAGEMENT,
> LCC, JAZZ PARLOR, LLC and ZYDEQUE, LLC, and against
> Plaintiff, 800 CANAL STREET LIMITED PARTNERSHIP, denying
> its Verified Petition for Eviction and Rule to Show Cause
> in accordance with and for the reasons set forth in the
> oral reasons for judgment read on February 25, 2010, in
> open court;
> IT IS FURTHER ORDERED...that Notice is hereby given

---

[9]This is according to the allegations of the federal
complaint.  The record in the state court proceedings show,
however, that the trial court permitted the Storyville subtenants'
perpetuation of May's deposition to explore the circumstances
giving rise to his letter.

to Defendants, STORYVILLE DISTRICT NEW ORLEANS, LLC,
BOURBON STREET MANAGEMENT, LLC, JAZZ PARLOR, LLC and
ZYDEQUE, LLC, of the mechanical bull constituting a
violation of the Comprehensive Zoning Ordinance of the
City of New Orleans, and the Sublease Agreement between
800 CANAL STREET LIMITED PARTNERSHIP and STORYVILLE
DISTRICT NEW ORLEANS, L.L.C., and the 30 day notice to
cure as required by Sublease Agreement shall begin from
February 25, 2010, the date Judgment was read in open
court, in accordance with and for the reasons set forth
in the oral reasons for judgment read on February 25,
2010 in open court....

The state court defendants (Storyville, et al.) appealed this
judgment on March 15, 2010, asserting that the state trial court
erroneously ordered them to remove the mechanical bull.  On May 6,
2010 800 Canal Street appealed the state court's denial of its
petition for eviction and its May 4 judgment denying its motion for
award of attorneys' fees and costs.  Those appeals are pending.

Other lawsuits are pending in state court between these
parties.

After 800 Canal Street filed its eviction proceeding,
Storyville filed a declaratory and injunctive action against 800
Canal Street in state court, seeking to enjoin 800 Canal Street
from evicting it from the leased premises and seeking a declaratory
judgment that it was not in violation of the sublease.  800 Canal
Street filed exceptions of lis pendens and no cause of action.
Storyville agreed that it could not enjoin the first-filed eviction
suit, and a judgment was entered, declaring the issue moot.  The
state court then granted 800 Canal Street's exception of lis
pendens, dismissing the suit.  Storyville appealed the dismissal

8

based on lis pendens; that appeal is also pending.

On April 1, 2010 Storyville again sued 800 Canal Street in state court, seeking declaratory and injunctive relief; Storyville also sought to recover attorneys' fees and costs it had incurred in the eviction lawsuit by 800 Canal Street. Storyville again sought to enjoin 800 Canal Street from terminating its sublease. Storyville also sought a determination as to whether certain violations that 800 Canal Street asserted were barred on the basis of res judicata. 800 Canal Street filed opposition papers and the injunctive relief hearing was continued, without date.

One week later, Jazz Parlor filed a mandamus suit against CSDC and Cynthia Connick in state court, seeking to order CSDC and Connick to put 800 Canal Street in default of its lease with CSDC. 800 Canal Street intervened and the defendants filed multiple exceptions. The hearing on the mandamus was then continued, without date.

Two months later, this federal suit was filed based on the state trial court's "erroneous ruling" in the eviction proceeding[10]: on June 9, 2010 the subtenants (Storyville, Bourbon Street Management, Howl at the Moon, and Jazz Parlor) sued CSDC, 800 Canal

---

[10]In contending that the state trial court erred, the plaintiffs in this federal suit suggest that the "state trial court...denied 800 Canal's eviction proceeding and granted judgment in favor of petitioners. However the court erroneously stated, in the nature of an advisory opinion, that because Paul May set forth in his letter...that the mechanical bull was a zoning violation, that the bull should be removed within 30 days."

Street, HRI, and Cynthia Connick, the executive director of the CSDC.  In their 54-page complaint, the plaintiffs assert various civil rights violations and constitutional violations arising out of the defendants' actions in the eviction proceeding.  They assert that the state court's ruling that the mechanical bull violated the CZO was "a direct result of the conspiracy among Connick, 800 Canal, HRI and others to have Paul May publish his letter based upon erroneous and incomplete information and to deprive Storyville of its constitutional rights of due process, equal protection and access to the courts regarding any alleged zoning violation."  In this federal suit, the plaintiffs assert a myriad of claims:

- In Count I, the plaintiffs allege that the defendants violated their civil rights under Section 1983 and 1985 by acting under color of state law and in conspiracy with one another to violate their procedural and substantive due process rights, that the defendants knew that the plaintiffs had a protected property interest in the leased premises, and that the defendants circumvented the normal procedures for alleged zoning violations, including by meeting with Paul May and convincing him to write a letter.
- In Count II, the plaintiffs assert that the defendants' conspiracy to use City actors to avoid the administrative process and penalize them for an alleged zoning violation violated their right to equal protection "by implementing a scheme which succeeded in failing to provide them the same remedies as afforded to others similarly situated."[11]
- In Count III, the plaintiffs assert that the defendants wrongfully used the May letter in an "attempt[] to enforce the erroneous position that 'live entertainment' is not allowed in

---

[11]The plaintiffs suggest that the law was clearly established at the time of the incident and that the defendants are not entitled to qualified immunity because they knew their actions were wrongful "in light of the conditional use ordinance; the comprehensive zoning ordinances and the specific 'permitted use' language in the subleases."

the leased premises," thereby impairing the contract (the sublease) that CSDC had previously approved, in violation of the Contracts Clause of the U.S. Constitution.

• The plaintiffs generally assert civil rights violations under Sections 1983, 1985, and 1986.[12]

• Invoking this Court's supplemental jurisdiction, the plaintiffs further assert various state law claims, including breach of contract, detrimental reliance, tortious interference with contract, and negligence.

The plaintiffs seek damages including attorney's fees, past lost revenue, loss of future revenue, business interruption losses, and punitive damages.

The defendants now seek dismissal of the plaintiffs' complaint based on lack of subject matter jurisdiction, invoking the <u>Rooker-Feldman</u> doctrine.  If the Court finds that it has subject matter jurisdiction, the defendants seek to dismiss the plaintiffs' claims for failure to state a claim.  Alternatively, the defendants urge the Court to abstain from hearing the plaintiffs' claims, or to stay this litigation pending resolution of the state court appeals.[13]

I.

Invoking the <u>Rooker-Feldman</u> doctrine, the defendants challenge this Court's subject matter jurisdiction pursuant to Federal Rule

---

[12]On December 2, 2010 the plaintiffs moved to dismiss their Section 1985 claims with prejudice.  The Court granted the motion.

[13]Following oral argument on these issues, the parties submitted supplemental papers in compliance with this Court's order that counsel address several issues regarding application of the <u>Rooker-Feldman</u> doctrine and the relevant abstention doctrines.

of Civil Procedure 12(b)(1).   The Court must consider this threshold matter of subject matter jurisdiction first.

<em>A.</em>

A lawsuit must be dismissed if it appears that the Court lacks subject matter jurisdiction.  Fed.R.Civ.P. 12(b)(1), (h)(3).   The party asserting jurisdiction bears the burden of establishing the Court's subject matter jurisdiction.  <u>Kokkonen v. Guardian Life Ins. Co. Of America</u>, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675 (1994).   The Court may base its decision on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts."   <u>Barrera-Montenegro v. United States</u>, 74 F.3d 657, 659 (5th Cir. 1996).

Federal district courts lack jurisdiction to entertain collateral attacks on state court judgments.  <u>United States v. Shepherd</u>, 23 F.3d 923, 924 (5th Cir. 1994); <u>Liedtke v. State Bar of Texas</u>, 18 F.3d 315, 317 (5th Cir. 1994), <u>cert. denied</u>, 115 S.Ct. 271 (1994), <u>reh'g denied</u>, 115 S.Ct. 626.  This "firmly established" principle is known as the <u>Rooker-Feldman</u> doctrine.   <u>Liedtke</u>, 18 F.3d at 317 (citing <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923) and <u>D.C. Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983)).  Application of the doctrine is limited to cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced

12

and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)(addressing the scope of the Rooker-Feldman doctrine to resolve a conflict among the courts of appeals). Federal authority to review a state court judgment lies exclusively with the Supreme Court of the United States. Id. at 292; Hale v. Harney, 786 F.2d 688, 691 (5th Cir. 1986)("[j]udicial errors committed in state courts are for correction in the state court systems, at the head of which stands the United States Supreme Court; such errors are no business of ours").

        This jurisdictional limitation cannot be evaded by asserting claims not raised in the state court proceedings or claims framed as original claims for relief. United States v. Shepherd, 23 F.3d 923, 924 (5th Cir. 1994). If the issues before the federal district court are "inextricably intertwined" with a state court judgment, the Court is "in essence being called upon to review the state-court decision", and federal court review is forbidden. Id.; Turner v. Cade, 354 Fed. App'x 108, 111 (5th Cir. 2009)(unpublished)(asserting new claims that were not raised in the state court proceedings will not defeat the Rooker-Feldman jurisdictional bar if the claims are "inextricably intertwined with a state judgment")[14] (quoting United States v. Shepherd, 23 F.3d

_____

        [14]In Turner, the Fifth Circuit held, in an unpublished opinion, that the plaintiff's allegations that private parties involved in her state court proceeding had conspired with the judge

13

923, 924 (5th Cir. 1994) (internal quotation marks omitted).
Further, "the casting of a complaint in the form of a civil rights
action cannot circumvent this rule." Liedtke, 18 F.3d 315, 317
(1994).    Indeed, "a petitioner's failure to raise his
constitutional claims in state court does not mean that a United
States District Court should have jurisdiction over the claims."
Feldman, 460 U.S. at 482 n.16, 103 S.Ct. at 1316 n.16.   Rather,
"[s]uch a failure may lead the party to 'forfeit his right to
obtain review of the state court decision in any federal court.'"
Chrissy F. by Medley v. Mississippi Dep't of Public Welfare, 995
F.2d 595, 599 (5th Cir. 1993), cert. denied, 510 U.S. 1214
(1994)(citing Feldman, 460 U.S. at 482 n.16, 103 S.Ct. at 1316
n.16).

*B.*

The defendants contend that this Court lacks subject matter
jurisdiction based on the Rooker-Feldman doctrine because the
plaintiffs essentially challenge the state court's ruling that the
mechanical bull violated the parties' sublease agreement.   The
plaintiffs counter that their assertion of civil rights violations
makes this suit a distinct proceeding that warrants federal review.

---

to deprive her of her constitutional rights were inextricably
intertwined with the state court proceeding because the Fifth
Circuit could not rule in the plaintiff's favor without overturning
the state court. Id. at 110-11.  Accordingly, the Fifth Circuit
affirmed the district court's dismissal on the basis of the Rooker-
Feldman doctrine. Id. at 111.

The Court disagrees.  The plaintiffs' claims here are obviously an attempt to seek federal review of their disappointment with the state court process, indeed a process that is still fully taking its course: the plaintiffs do not deny that they appealed the state court's February 26, 2010 order, asserting that the state court erroneously ordered them to remove the mechanical bull.  Indeed, they assert in their federal complaint that the state court erred in its ruling.  However, the parties have failed to adequately address in their papers whether the state court ruling is sufficiently final to trigger the application of the <u>Rooker-Feldman</u> doctrine.[15]

The defendants insist that the Fifth Circuit's ruling in <u>Hale v. Harney</u> is controlling here: in 1986, the Fifth Circuit ruled that <u>Rooker-Feldman</u> is not limited to final state court judgments or orders on which appeals have been exhausted.  <u>Hale v. Harney</u>, 786 F.2d 688, 691 (5th Cir. 1986).[16]   In <u>Hale</u>, the plaintiff

---

[15]Having failed to address this issue in their initial papers, the Court ordered submission of supplemental papers following oral argument.  These supplemental papers give short shrift to the issue, with the plaintiffs focusing only on one unpublished Fifth Circuit opinion, and the defendants focusing on an older published Fifth Circuit case, with no analysis of either potentially intervening Supreme Court law, or more recent unpublished Fifth Circuit opinions to the contrary.

[16]Several years later, without overruling or even mentioning its decision in <u>Hale</u>, the Fifth Circuit stated in dicta that Rooker-Feldman did not apply in a FIRREA removal case because the underlying state court judgment was not final.  <u>In re Meyerland Co.</u>, 960 F.2d 512 (5th Cir. 1992).

challenged a state court divorce decree in federal court by asserting civil rights claims against his ex-wife, her attorney, and the judge who entered the decree; he filed the federal suit while his appeal of the state court judgment was pending. _Id._ at 689. The federal district court dismissed the plaintiff's collateral attack of the state court judgment, and the plaintiff appealed to the Fifth Circuit. _Id._ The Fifth Circuit affirmed the district court's judgment, ruling that the federal suit was "inextricably intertwined" with the state court action, even though the state district court judgment was on appeal, observing:

> We hold no warrant to review even final judgments of state courts, let alone those which never take final effect because they remain subject to revision in the state appellate system. Constitutional questions such as these are, to employ the Supreme Court's phrase in Feldman, "inextricably intertwined" with questions of the validity of the state court's decree, questions reviewable in the state system; and the district court correctly dismissed the complaint containing them as beyond its jurisdiction.

_Id._ at 690-91. It is clear that, if _Hale_ controls, the _Rooker-Feldman_ doctrine bars the plaintiffs' federal lawsuit here, even though state appellate proceedings are pending.

The plaintiffs, without mentioning _Hale_, seem to suggest that developments since _Hale_ undermine the ruling insofar as _Hale_ applied _Rooker-Feldman_ in spite of the pending state appellate proceedings. Ultimately, the Court agrees.

At the outset, the plaintiffs correctly note that the Fifth Circuit has observed, since _Hale_:

> Exxon Mobil tells us when a state court judgment is
> sufficiently final for operation of the Rooker-Feldman
> doctrine: when "the state proceedings [have] ended." At
> the time appellants filed this federal lawsuit, their
> state proceedings had not ended.  The state case was on
> appeal to the Louisiana appellate court.  Accordingly,
> the Rooker-Feldman doctrine is inapplicable.

Rowley v. Wilson, 200 Fed.Appx. 274, (5th Cir. Aug. 4,

2006)(unpublished) (internal citations omitted).  Rowley is an

unpublished *per curiam* opinion.  Therefore, pursuant to 5th Circuit

Rule 47.5.4, Rowley is not precedent except under certain limited

circumstances not present here.  Accordingly, the Court also looks

to other authority analyzing Exxon Mobil's gloss on Rooker-Feldman

to determine whether Exxon Mobil so limited Rooker-Feldman as to

make it inapplicable, as the plaintiffs maintain, to state court

judgments that are on appeal in the state system.[17]

     Two camps have emerged post-Exxon Mobil.  One camp is

---

[17]The Supreme Court in Exxon Mobil articulated its holding
as follows:

> The *Rooker-Feldman* doctrine, we hold today, is
> confined to cases of the kind from which the
> doctrine acquired its name: cases brought by
> state court losers complaining of injuries
> caused by state-court judgments rendered
> before the district court proceedings
> commenced and inviting district court review
> and rejection of those judgments. *Rooker-
> Feldman* does not otherwise override or
> supplant preclusion doctrine or augment the
> circumscribed doctrines that allow federal
> courts to stay or dismiss proceedings in
> deference to state court actions.

544 U.S. 280, 284, 125 S.Ct. 1517, 1521-22, 161 L.Ed.2d 454 (2005).

comprised of courts that have found Rooker-Feldman inapplicable
unless all state proceedings, including appeals, have been resolved
before the federal suit begins. See, e.g., Nicholson v. Shafe, 558
F.3d 1266, 1275-76 (11th Cir. 2009)("[B]ecause an appeal remained
pending in the state court action at the time the Appellants filed
the instant [federal] case, the state court proceedings had not
ended for the purposes of Rooker-Feldman...."); Guttman v. G.T.S.
Khalsa, 446 F.3d 1027, 1032 (10th Cir. 2006)("In this case,
[plaintiff] filed his federal suit while his petition for
certiorari to the New Mexico Supreme Court was pending. His state
suit was not final. As such, the Rooker-Feldman doctrine does not
bar his federal suit...."); Dornheim v. Sholes, 430 F.3d 919, 923-
24 (8th Cir. 2005)("At the time that the [plaintiffs] commenced this
federal action, the state court adjudication was not complete"
because state appellate proceedings were pending after the filing
of the federal action); Federacion de Maestros de P.R. v. Junta de
Relaciones del Trabajo de P.R., 410 F.3d 17, 27 and n.13 (1st Cir.
2005). These decisions generally focus on the language in Exxon
Mobil that the Fifth Circuit's unpublished Rowley opinion invoked:
Rooker-Feldman applies when "the losing party in state court filed
suit in federal court after the state proceedings [have] ended...."
See Rowley, 200 Fed.Appx. 274, 275 (5th Cir. Aug. 4,
2006)(unpublished). State proceedings have not ended, the

reasoning goes, if state appeals are still pending.[18]

A second camp disagrees with this reasoning. This other line of cases, like the Fifth Circuit did pre-Exxon Mobil in Hale, applies Rooker-Feldman as long as the federal suit seeks review of a previously-rendered state court judgment, regardless of whether that judgment is being appealed in the state court system when the federal suit begins. See, e.g., Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, 701 F. Supp. 2d 340, 347 (E.D.N.Y. 2010); Plummer v. State Bar of Arizona, No. 08-1630, 2009 WL 2222713 (D. Ariz. July 23, 2009); Field Auto City v. General Motors Corp., 476 F. Supp. 2d 545, 553 (E.D. Va. 2007)("a federal suit is no less an appeal [of] the state trial court judgment simply because state appeals are not yet final...[a]nd, the purpose and function of Rooker-Feldman are no less implicated and important in cases where the state appeal becomes final before or after the federal suit is filed"); Sinclair v. Bankers Trust Co. of California, N.A., No. 05-72, 2005 WL 3434827, at *3 (W.D. Mich. Dec. 13, 2005)("[u]nlike Exxon Mobil, the state court proceedings between [the defendants and the plaintiff] reached judgment before [the plaintiff] filed her federal claim...the state court proceeding that must reach judgment before a federal complaint is filed for Rooker-Feldman to be

---

[18]Of course, as the First Circuit has observed, if the state action has reached a point where neither party seeks further action, this, too, means that the proceedings have "ended." Federacion de Maestros de P.R., 410 F.3d at 24-25.

applicable is the appealable trial court's judgment...").

The Court determines that the first camp -- in requiring that the state proceedings have ended, which includes the requirement that the appellate process has been exhausted (if undertaken) -- is the most supportable.  The law in the Fifth Circuit is hardly conclusive, given that the appellate court has not expressly overruled <u>Hale</u>.  However, unpublished Fifth Circuit opinions signaling that <u>Exxon Mobil</u> has so limited the scope of the <u>Rooker-Feldman</u> doctrine as to make it inapplicable to cases such as the pending matter, where the state appellate process is incomplete and pending,[19] and this Court's own independent review of <u>Exxon Mobil</u> and other scholarship and case literature persuades the Court that <u>Rooker-Feldman</u> is inapplicable here.  Furthermore, the text of the statutory underpinnings of the <u>Rooker-Feldman</u> doctrine, 28 U.S.C. § 1257, bolsters this conclusion.[20]

---

[19]<u>See</u> <u>LAC Real Estate Holdings, L.L.C. v. Biloxi Marsh Lands Corp.</u>, 320 Fed.Appx. 267 (5th Cir. Apr. 8, 2009)(holding that Rooker-Feldman doctrine has no application where "[t]he state court proceedings are still pending and no final judgment has been rendered"); <u>see</u> <u>also</u> <u>Rowley</u>, 200 Fed.Appx. at 275.

[20]Section 1257 provides:

(a) Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United

          States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

Here, Congress clearly reserved to the U.S. Supreme Court appellate jurisdiction over state court judgments "rendered by the highest court of a State[.]" As Exxon Mobil made clear:

          Rooker and Feldman exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority, e.g., ... § 1331 (federal question), and § 1332 (diversity). In both [Rooker and Feldman], the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment. Plaintiffs in both cases, alleging federal-question jurisdiction, called upon the District Court to overturn an injurious state-court judgment. Because § 1257, as long interpreted, vests authority to review a state court's judgment solely in [the Supreme Court], the District Courts in Rooker and Feldman lacked subject matter jurisdiction. See [Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 644 n.3, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)]("The Rooker-Feldman doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to this Court, see § 1257(a)").

Exxon Mobil, 544 U.S. at 291-92. The Supreme Court went on to note that "Congress, if so minded, may explicitly empower district courts to oversee certain state-court judgments and has done so,

While the plaintiffs' claims here are obviously an attempt to seek federal review of state court process, that process is still taking its course: the plaintiffs do not deny that they appealed the state court's February 26, 2010 order, asserting that the state court erroneously ordered them to remove the mechanical bull.  It is the unfinished and ongoing posture of the state court appellate process that presents a procedural obstacle to the defendants' invocation of Rooker-Feldman.  See LAC Real Estate Holdings, L.L.C. v. Biloxi Marsh Lands Corp., 320 Fed.Appx. 267 (5th Cir. Apr. 8, 2009)(holding that Rooker-Feldman doctrine has no application where "[t]he state court proceedings are still pending and no final judgment has been rendered"); see also Rowley, 200 Fed.Appx. at 275.  Because a threshold procedural condition for the application of Rooker-Feldman is not met (the state court proceedings have not ended within the meaning of Exxon Mobil), this Court has subject matter jurisdiction to entertain this suit.

II.

As noted above, the state court proceedings are still pending -- no final judgment has been rendered.  Nevertheless, the Court is not now forced to act as an appellate tribunal of the state district court judgment.   Because this case involves parallel

most notably, in authorizing federal habeas review of state prisoners' petitions.  28 U.S.C. § 2254(a)."  Id. at 292 n.8.

state and federal litigation, the Court next considers whether "[c]omity or abstention doctrines may...permit or require [the Court] to stay or dismiss the federal action in favor of state-court litigation." See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 292 (2005).

A.   Colorado River Abstention Doctrine

Federal courts have a "virtually unflagging" obligation to exercise the jurisdiction granted to them. Colo. River Water Conservation Dist. V. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Accordingly, the mere "pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Id. (quoting McClellan v. Carland, 217 U.S. 268, 282, 30 S.Ct. 501, 54 L.Ed. 762 (1910)). In "extraordinary and narrow" circumstances, however, a district court may abstain from exercising its jurisdiction. Id. at 813 (noting that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule").

As a threshold matter, a stay of federal proceedings under Colorado River may be considered when the federal and state cases are parallel, which generally means that the actions involve the same parties and same issues. See Stewart v. Western Heritage Ins. Co., 438 F.3d 488, 491 (5ᵗʰ Cir. 2006). Once it is determined that the state and federal cases are parallel, the Court must determine

if "exceptional circumstances" warrant abstention by applying six[21]

relevant factors:

> (1)  assumption   by   either   court   of
>      jurisdiction over a res,
> (2)  relative inconvenience of the forums,
> (3)  avoidance of piecemeal litigation,
> (4)  the  order  in  which  jurisdiction  was
>      obtained by the concurrent forums,
> (5)  to what extent federal law provides the
>      rules of decision on the merits, and
> (6)  the adequacy of the state proceedings in
>      protecting  the  rights  of  the  party
>      invoking federal jurisdiction.

Id. (citations omitted).  "[T]hese factors [are not applied]

mechanically, but carefully balance[d]...'with the balance heavily

weighted in favor of the exercise of jurisdiction.'"  Id. (quoting

Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp., 460 U.S. 1, 16,

103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

B.

Applying  these  factors  demonstrates  that  exceptional

circumstances  permit  the  Court  to  abstain  from  exercising

jurisdiction  in  deference  to  the  ongoing  state  appellate

proceedings.[22]  The first two factors are neutral and, therefore,

---

[21] The Supreme Court announced the first four factors in
Colorado River Water Conservation Dist. v. United States, 424 U.S.
800, 817 (1976) and the last two in Moses H. Cone Mem'l Hosp. v.
Mercury Constr. Corp., 460 U.S. 1, 8-13 (1983).

[22]The Court finds that there are parallel proceedings,
notwithstanding the plaintiffs' insistence on splicing the various
state proceedings and noting which parties are parties to which
state action.  Here, there is no dispute that substantially the
same parties are litigating substantially the same issues.  As for
the same parties, same issues requirement for parallel litigation,

weigh against abstention:   the federal court has not assumed
jurisdiction over any res, and there is no inconvenience to the
parties to try the case in state court versus federal court, both
are in New Orleans.  See Murphy v. Uncle Ben's, Inc., 168 F.3d 734,
738 (5th Cir. 1999)(holding that the absence of the first and second
factors weighs against abstention).  The third and fourth factors
strongly favor abstention:   to continue this federal suit would be
to promote, rather than avoid, piecemeal adjudication of matters
that have been proceeding for some time in state court; indeed,
there are several matters on appeal in the state system, given that
this federal suit was not filed until after the state trial court
issued its judgment resolving the parties' dispute over whether the
mechanical bull violated the sublease (because it violated the
zoning ordinance).  In contrast to the progress made in state court
between the many parties on various issues, this federal case has
not progressed past the filing of the instant motion by the

---

the Fifth Circuit and other Sections of this Court have not always
insisted on precise identity of parties.  See Republic Bank Dallas
Nat'l Ass'n v. McIntosh, 828 F.2d 1120-, 1121 (5th Cir. 1987)(per
curiam)("[I]t may be that there need not be applied in every
instance a mincing insistence on precise identities of these[.]");
Kenner Acquisitions, L.L.C. v. BellSouth Telecommunications, Inc.,
No. 06-3927, 2007 WL 625833, at *2 (E.D. La. Feb. 26, 2007)(Vance,
J.)("in this case, the proceedings, while not absolutely
symmetrical, consist of substantially the same parties litigating
substantially the same issues"); Mahbod v. New York Life Ins. Co.,
No. 05-3266, 2006 WL 2513423, at *3 (E.D. La. Aug. 25,
2006)(Fallon, J.)(finding that proceedings were parallel for the
purposes of Colorado River even though a new defendant was added to
the federal proceeding, where the claims arose out of substantially
similar facts).

defendants.  As for the fifth and sixth factors, although federal constitutional law is implicated, in part (along with state law claims), the plaintiffs concede that the state court is adequate in protecting their rights, as shown by the several suits filed in state court (and now consolidated before the same judge); there is no concern that the state court would fail to protect the plaintiffs' federal rights.  Because applying the <u>Colorado River</u> factors weighs in favor of abstention, the Court finds that a stay of these proceedings is appropriate.

Because the Court has determined that abstention is appropriate, it need not address the defendants' remaining arguments.  Accordingly, IT IS ORDERED: that the defendants' motion is DENIED in part, insofar as it sought dismissal for lack of subject matter jurisdiction and GRANTED in part, insofar as it sought a stay of proceedings in deference to the ongoing state court litigation.  Because the case will be stayed until the parallel state court proceedings are resolved, IT IS FURTHER ORDERED: that the case is closed administratively for statistical purposes.

New Orleans, Louisiana, March 28, 2011.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

26